**SPORTSERVICE CORPORATION,**
**Plaintiff,**

v.

**PITTSBURGH ATHLETIC COMPANY**
**INC. et al., Defendants.**

**C. A. No. 70–14.**

United States District Court,
W. D. Pennsylvania.

Aug. 30, 1972.

Roslyn Litman, Howard A. Specter (Litman, Litman, Harris & Specter), Pittsburgh, Pa., for plaintiff.

Judd N. Poffinberger, Jr., Kenneth L. Salmon, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for defendant.

## ADJUDICATION

WILLSON, Senior District Judge.

### I. MEMORANDUM

This is a lawsuit brought by Sportservice Corporation ("Sportservice") of Buffalo, New York, against Pittsburgh Athletic Company, Inc., ("Pirates") and others to recover damages and to obtain injunctive relief for breach of an alleged contract between Sportservice and the Pirates concerning the concession business conducted by Sportservice at Forbes Field in Pittsburgh. Beginning with the 1970 baseball season, the Pirates began to play their home games at the new Three Rivers Stadium in Pittsburgh. Sportservice claims that it ought to be the concessionaire at Three Rivers Stadium, and since another company serves as concessionaire there, Sportservice is entitled to damages for breach of contract. Plaintiff has asked this Court to find that it owns the concession rights at Three Rivers Stadium for the period which will end in the year 2011.

The non-jury trial of this civil action on liability only, which was transferred from the Eastern District of New York to this court, has been concluded. This litigation is now ready for final decision. Extensive discovery has been had by both parties, and several issues have been presented by motion and also have been raised in pretrial proceedings and conferences. As the background and factual situation of the long-time business arrangement between these parties was explored, it became increasingly ap-

parent that the key to the decision was whether the two corporations, that is plaintiff and defendant, became bound by a letter understanding dated October 9, 1946, (Plf. Ex. 2), written by Louis M. Jacobs as President of Penn Sportservice, Inc., plaintiff's predecessor, and approved and accepted by Frank E. McKinney, as President of Pittsburgh Athletic Company, Inc., the principal defendant in this case. Although several officers of the corporate defendant were also joined as defendants, the evidence fails to disclose any liability on their part so that if there is liability to plaintiff it is only the liability of the corporate defendant.

At the final oral argument, this Court announced the decision in this case in favor of the defendant. Counsel for both sides, however, have filed proposed Findings and Conclusions. In their brief, plaintiff's counsel stated the issues as follows:

A. Did the October 9, 1946, amendment to the December 29, 1944, contract constitute a valid contract?

B. If the October 9, 1946, agreement was valid, was it subsequently modified by the parties to a year to year agreement?

For clarity as to plaintiff's position, the statement of facts in the brief submitted by plaintiff's counsel is attached hereto as Appendix A.

This is plaintiff's view of what the evidence reveals. But plaintiff's summary of the evidence in its behalf is not accepted by this Court. In the first place and without giving consideration to the long-time relationship between these parties, the first sentence of the October 9, 1946, letter on which plaintiff relies says in part:

". . . . your desire that we change our per capita arrangement in our present concession contract dated December 29, 1944 . . . . ."

It is to be noted that Plaintiff's Exhibit 1 is a formal concession agreement signed by defendant and plaintiff's predecessors in which each corporate seal is attached with the signatures of the Presidents and attestation by witnesses. In other words, the 1944 Concession Agreement was a formal document executed in a manner to bind corporate entities. This document is in some 12 numbered paragraphs with subdivisions, and in Paragraph 11, the five calendar years of its duration are set out. It expired at the end of 1950. What the plaintiff's summary of the facts does not reveal is that when McKinney's syndicate purchased the Pirates in 1946 McKinney had borrowed $330,000.00 from Louis M. Jacobs to enable him to purchase forty percent of the Pirate stock. "A piece of the action" was that $250,000.00 of this loan was to be interest free but on sale of the Pirates, McKinney was to divide any profit on the sale of that portion of his stock purchased by the proceeds of the $250,000.00 loan, with Jacobs. In fact, when McKinney did sell his interest to Messrs. Galbreath and Johnson in 1950, Jacobs made a profit of $46,000.00 of McKinney's investment in the defendant's stock.

It is clear under the evidence that the October 9, 1946, letter understanding between Jacobs and McKinney was never presented to the Board of Directors of the defendant. Defendant's Board of Directors was, however, informed by McKinney of the change in the amount of the concession payments and the basis for those payments, that is, from per capita to percentage. But there is no evidence in this case that during McKinney's presidency of the defendant corporation that he ever informed his associates of his loan arrangement with Jacobs nor of his long-time extension of the term of the 1944 Concession Agreement as set out in the October 9, 1946 letter. When Galbreath and Johnson bought McKinney's stock in 1950, they brought in Branch Rickey, an experienced baseball man and a man whose integrity was and is well known, to operate the Pirate organization. Mr. Rickey soon learned that the October 1946 letter was in the

files. From then on until this lawsuit was filed and even now the subject matter of that letter was a point of controversy between these parties.

There has been considerable testimony as well as argument by counsel as to what was said and done at a Buffalo meeting held in January 1953, attended by Galbreath, Johnson, and Jacobs. Mr. Rickey disapproved of Mr. Jacobs' method of doing business and did not attend the meeting. However, an exchange of letters between Jacobs and Johnson, (Dft. Exs. A and B), both written after the Buffalo meeting, clearly indicate that defendants disavowed the term of the 1946 letter and that these men were attempting to reach a new amicable arrangement as to the duration of plaintiff's concession agreement as well as the disposition of plaintiff's property at the end of a new contract term. The evidence is clear that by January 1953 the officers of defendant, Galbreath and Johnson, had concluded that McKinney had no authority to bind the corporation to the long-term contract containing the automatic extension from year to year based on each $5,000.00 expenditure by plaintiff and so informed Jacobs at the Buffalo meeting. Defendant's Exhibit A is Jacobs' letter to Johnson dated January 26, 1953. A careful reading of this letter convinces one that Galbreath, then defendant's President, did inform Jacobs that defendant would not go along with the long-term arrangement and was insisting on an amicable arrangement extending not beyond 1957. It is noted that Jacobs in his letter refers to a proposed new understanding which when consummated, he says:

"Finally under such an arrangement, which I feel is basically fair, we, of course, forego any rights or privileges or whatever they may be termed which we have under our present agreements, which we entered into, and in reliance thereon expended more and more money feeling assured of a long term arrangement. Since, however, it is not satisfactory to you and Mr. Galbraith, I do want to go all out,, so to speak, and feel that this formula is self proof to you of my desire to satisfy, and I do this, because, I repeat, I am reasonably certain that at the close of 1957 our relationship will be on the same favorable basis as it is with certain other clubs, such as Detroit, Cincinnati and the White Sox organizations in particular, where there have been renewals followed by renewals;    ."

The letter of Jacobs and Johnson's reply thereto, (Dft. Ex. B), certainly show that defendant's position with respect to McKinney's lack of authority and breach of his fiduciary relationship had been asserted at the Buffalo meeting. In his letter Johnson says he understood that Mr. Galbreath had reached an agreement with Jacobs: "That all prior letters and understandings existing between yourself and Mr. McKinney be abrogated."

■ Plaintiff's counsel strongly contend in this case that by the course of dealing between these parties the letter agreement of October 9, 1946, if not valid when executed, was confirmed and ratified by subsequent conduct of the officers of defendant. The Court disagrees with that proposition. Shortly after the Buffalo meeting, counsel for defendant prepared Defendant's Exhibit E, which was to be the new agreement between the parties and which was to be formally executed. This contract is in accord with the testimony of Johnson and Galbreath and in accord with the letters also written by Johnson on the subject. In a letter written June 4, 1953, from plaintiff to Johnson, (Dft. Exhibit D), the new agreement is mentioned with a statement that the increase percent rental is mutually acceptable, and the April payment is enclosed. However, it should be mentioned that the new written contract was never executed by the parties. This Court is convinced that Jacobs would not execute the new written contract because the parties could not reach a clear understanding as to the method of reimbursing plaintiff

for its investment in concession equipment and improvements in the event the concession contract was not renewed after 1957. It should be emphasized at this point that plaintiff had had concession rights to the Pirates' home games at Forbes Field since 1920. The arrangement was profitable. From time to time the payments to the Pirates were scaled upwards by plaintiff, but the parties had reached an impasse with respect to two items. One was the length of term of the concession rights to be held by plaintiff. The other item which certainly bothered Jacobs was that his investment in the concession facilities would be jeopardized in the event of a short-term contract. This is illustrated in his letters and especially in the October 9, 1946, letter which is relied on by plaintiff. In that letter he quotes McKinney as expressing a desire to insure over a long-term range of at least 25 years various improvements in the refreshment department, and so forth. Considering all the aspects of the association between plaintiff and defendant, as they existed in 1953, this Court has concluded that both parties recognized the non-validity of the long term written into the letter of October 9, 1946, by Jacobs. Thus, this Court has concluded that the course of events shows that the October 9, 1946, letter agreement only executed by McKinney and Jacobs was held in limbo so to speak during the ensuing years. If the plaintiff had any rights under the agreement, Jacobs was reluctant to surrender them. But the defendant after 1953 considered that the concession operation was on a year-to-year basis or at the most on a five-year basis, as provided in Defendant's Exhibit E.

It is noticed also that the 1944 Concession Agreement to which the 1946 letter refers grants "the exclusive privilege of selling scorecards and refreshments at the first party's baseball park, known as Forbes Field, in the City of Pittsburgh, . . . ."

The first time bids were requested by defendant for the concession rights to the new Three Rivers Stadium, plaintiff put in a bid which could not be considered because of the failure of the financing for the stadium. Although this clause as to Forbes Field is not dispositive of the litigation, it can be argued that the 1944 Concession Agreement and any amendments thereto would be effective only as long as Forbes Field was the place of defendant's baseball operations.

■ This Court believes that it needs no citation of authority to conclude in this case that Louis M. Jacobs, an experienced businessman and himself a corporate executive, well knowing that he had a secret arrangement with McKinney which would enhance his share of McKinney's stock value in defendant in the event of a profitable sale, was himself required to divulge to the Pirates' management not only his arrangement with McKinney, but also contemporaneously therewith secure from the Pirates organization the formal execution of the October 9, 1946, amendment to the former contract. Jacobs is charged with knowledge that both he and McKinney were double-dealing with respect to the loan to McKinney and the 1946 agreement.

■■ Plaintiff's secondary position in this case is that if it be held, which it will be, that the plaintiff has no term agreement with respect to concession rights, then it is entitled to restitution or some sort of indemnity by reason of its expenditures over the years which it says enhanced and increased the benefits of the Forbes Field concession facilities. These expenditures by plaintiff were made soon after and with respect to the McKinney management of the Pirates organization. McKinney breached his fiduciary relationship with his corporation by his failure to divulge his loan arrangement with Jacobs. As President he could not bind the defendant corporation to the long-term agreement by way of a letter between himself and Jacobs. This proposition needs no citation of authority. Jacobs being an experienced businessman and, to repeat, a long-time

corporate executive, well knew that McKinney had breached his fiduciary duties to his corporation. Jacobs' knowledge is imputed to plaintiff. At that time plaintiff was dominated by Louis M. Jacobs. Plaintiff's concession business was in the first instance founded by Jacobs Brothers of Buffalo. Louis M. Jacobs was a founder. Jacobs Brothers did business under various corporate entities, but until his death Louis M. Jacobs was the dominant personality in plaintiff's concession business.

Plaintiff's counsel refers this Court to various principles of law, which in some instances permit a reimbursement under voidable agreements. Plaintiff's counsel asserts that Jacobs' loan to McKinney at most rendered the concession agreement voidable and it was never rescinded by the corporate defendant. The short answer to that proposition is that when Mr. Rickey discovered the 1946 letter in the files defendant did take action as evidenced by the Buffalo meeting and what took place thereafter. Defendant disavowed the 1946 agreement in 1953 and never thereafter recognized it. During the Buffalo meeting and thereafter defendant only had suspicion of the secret loan by Jacobs to McKinney. But as a matter of law in the first instance the manner of execution of the so-called October 9, 1946, agreement, that is by the Presidents only, did not create a valid, corporate binding concession agreement. It was disavowed and was not ratified by the course of conduct or dealing between the parties. These parties were in business together until the end of 1969. Plaintiff did not bring a lawsuit to enforce the 1946 letter until after the Pirates terminated the business arrangement because of moving to Three Rivers Stadium. As the Court sees it, plaintiff's counsel is suggesting that defendant did not rescind the 1946 letter because it did not take legal action to set it aside. This Court has concluded that defendant's officers in 1953 and thereafter were neither required to terminate the operation of the Forbes Field concession by plaintiff in order to set aside the 1946 letter understanding between McKinney and Jacobs nor to bring a lawsuit to terminate it. By the same token, plaintiff is not in a position at this late date to claim any restitution because of its investment in the improvements to the Forbes Field concession area under the arrangements made with McKinney. Even under that agreement, McKinney and Jacobs were discussing improvements which would last over a period of 25 years. Plaintiff has had the benefit of the improvements it made for the period from 1946 to 1969. McKinney has testified that the improvements made by plaintiff to the Forbes Field concession area were what he termed a one-shot deal. Plaintiff's improvements were installed by the same contractor who renovated the whole Forbes Field structure when McKinney's group acquired the Pirates. Although unknown at the time, McKinney's and Jacobs' secret arrangement rendered this whole transaction a nullity so far as any executory phases of the arrangement were concerned.

The law of Pennsylvania applies in this case. Pennsylvania treats a fully executed illegal contract as a matter in repose. See the recent discussion by Judge Gibbons of the Court of Appeals for the Third Circuit in Knuth v. Erie-Crawford Dairy Cooperative Association, et al., 463 F.2d 470, 479, decided June 28, 1972. Neither from any equitable nor from any legal standpoint is plaintiff entitled to any reimbursement for its expenditures at Forbes Field made during the McKinney management.

It should be emphasized that the Court's decision in defendant's favor is based on what the Court considers to be the overwhelming weight of the evidence showing non-liability on the part of the defendant. Plaintiff has failed to prove its case by the fair preponderance of the evidence. The Court accepts the Findings of Fact and the Conclusions of Law as submitted by counsel for defendant. These Findings and Conclusions are in considerably more detail than the Findings mentioned in the Memorandum,

but, nevertheless, are fully supported in the evidence.

## ORDER FOR JUDGMENT

In accordance with the foregoing Memorandum and the Findings and Conclusions, it is directed that judgment be entered against the plaintiff and in favor of all the defendants.

## APPENDIX A

### I. STATEMENT OF FACTS

Plaintiff served as concessionnaire at Pittsburgh Pirate home baseball games from the 1920's until December, 1969. On or about December 29, 1944, plaintiff and defendant consummated a written concession contract which was admitted at the trial of this action as plaintiff's Exhibit 1 (hereinafter referred to as PX 1). That contract gave plaintiff the right to serve as concessionnaire for a five-year term from January 1, 1946, through December 31, 1950. It provided also that plaintiff was to pay to defendant a *per capita* sum for each patron who attended a Pirates' home baseball game.

In July, 1946, while the parties were operating under the terms of PX 1, Frank J. McKinney (hereinafter referred to as McKinney) purchased an option to buy approximately 70% of defendant's outstanding stock. Thereafter, a syndicate consisting of McKinney, Thomas B. Johnson (hereinafter referred to as Johnson), John Galbreath (hereinafter referred to as Galbreath) and Harold "Bing" Crosby (hereinafter referred to as Crosby) was formed and, in early August, 1946, that syndicate purchased the stock covered by McKinney's option. McKinney purchased approximately 40% of that stock and owned the largest interest of the four investors. Of the four, only McKinney was experienced in professional baseball. The syndicate vested control of defendant's operation in McKinney and he served as President and chief executive officer of the defendant from the time of the 1946 acquisition until 1950 when he sold his stock to Johnson and Galbreath. Johnson, Galbreath and Crosby have served as officers and members of the Board of Directors of the corporate defendant since the 1946 acquisition.

As the operating head of Pittsburgh Athletic Company, Inc., and the only member of the syndicate with any experience in baseball, McKinney ran defendant's entire operation. Neither his judgment nor his acts were ever questioned or criticized. During his tenure he entered into hundreds of contracts including, among others, construction contracts, public relations contracts, radio contracts, housing and facilities contracts and contracts for the purchase and sale of professional athletes. At that time, major league baseball was not the huge successful commercial enterprise that it is today and it was run only on an infrequent catch as catch can basis. McKinney's co-directors, the other 3 members of his syndicate, were all prominent persons who paid little, if any, attention to defendant's operations and left matters entirely in McKinney's hands.

At the time of the syndicate's takeover in 1946, Forbes Field, the stadium at which the Pirates played their home games, was in need of extensive rehabilitation. Because the rehabilitation program was going to cost substantially more than originally contemplated and because McKinney desired to secure a satisfactory long-term concession agreement for defendant, McKinney sought plaintiff's financial assistance along with the renegotiation of PX 1. Following a period of negotiations between McKinney, as defendant's representative, and Louis M. Jacobs (hereinafter referred to as Jacobs), then president of plaintiff, PX 1 was amended by a letter agreement dated October 9, 1946. That letter was admitted at trial as plaintiff's Exhibit 2 (hereinafter referred to as PX 2).

PX 2 provided that plaintiff would pay defendant a percentage of its concession and advertising revenues rather

than a fixed *per capita* sum for each person in attendance. The amendment also provided, in keeping with McKinney's request, that plaintiff would, at its expense, make substantial improvements in the confession facilities at defendant's ballpark. As consideration therefore and to guarantee a long term relationship between the parties, as well as to aid plaintiff in amortizing and justifying its anticipated expenditures, the expiration date of PX 1 was extended from December 31, 1950, for an additional five years to the end of 1955 and thereafter for one additional year for each $5,000 expended by plaintiff in the rehabilitation program. Jacobs also agreed to treat defendant on a most favored nation basis whereby plaintiff would pay for concession rights at the most favorable prevailing rate for any comparable situation. That agreement was also communicated to Johnson in later years and the rate was adjusted from time to time since McKinney's term of office. Although plaintiff contends that McKinney's authority was such that it was unnecessary to present either the written contract or its terms to defendant's Board of Directors, McKinney did so and it was approved at Board meeting on December 4, 1946. That approval is reflected in the meeting's minutes which were admitted at trial as plaintiff's Exhibit 4 (hereinafter referred to as PX 4).

Following the execution and approval of PX 2, plaintiff renovated the then existing concession facilities at Forbes Field and also installed extensive new facilities during the first half of 1947. Although it was originally anticipated that plaintiff's expenditures would amount to approximately $60,000, costs were necessarily higher than anticipated and plaintiff spent approximately $193,000 for architectural and construction services.

Although defendant denies knowledge of PX 2 prior to 1951 or 1952 and asserts that the parties entered into a year to year agreement in 1953, its conduct since October 9, 1946, has been consistent with its recognition of the existence of a long-term contract. During August, 1948, James A. Herron (hereinafter referred to as Herron), who has been one of defendant's officers since 1946, referred to and asserted the terms of PX 2 in correspondence directed to plaintiff. Those letters were admitted at the trial of this action as plaintiff's Exhibits 10 and 11 (hereinafter referred to as PX 10 and PX 11). Furthermore, defendant's copy of PX 1 bears a handwritten notation which reflects the fact that the parties entered into a new agreement which extended the term of the contract and changed the payment provisions effective with the 1947 season. At least part of the notation is in Herron's handwriting. The notation must have been made between 1946 and 1950 because Herron referred to the office of Roy Hamey, who was general manager from 1946 until December, 1950. In October, 1953, nearly three years after PX 1 would have expired had it not been extended by PX 2, Herron, as defendant's treasurer acknowledged in writing the continued existence of plaintiff's rights under the terms of PX 1. That writing was admitted at trial as plaintiff's Exhibit 13 (hereinafter referred to as PX 13). In 1957, defendant again recognized its long term agreement when it borrowed from plaintiff the sum of $200,000 as an advance against concession income for the future years 1958, 1959, 1960 and 1961. That recognition is reflected in the letter of September 26, 1957, which was admitted at the trial of this action as plaintiff's Exhibit 12 (hereinafter referred to as PX 12). Johnson acknowledged the long term agreement as late as October 16, 1963, when he asked Jacobs to make whatever adjustment he, Jacobs, might feel warranted for the years 1963, 64, 65 and 66. A copy of Johnson's letter was admitted at the trial as defendant's Exhibit F (hereinafter referred to as DX F).

In January, 1953, Johnson and defendant's counsel, Robert L. Kirkpatrick, who is also Johnson's law partner, met

in Buffalo, New York with Jacobs and Sportservice's counsel, Benjamin J. Reisman, to seek renegotiation of PX 2. Neither Reisman nor Kirkpatrick was called upon to testify concerning the results of that lengthy meeting. The record indicates that Reisman was too ill to attend the trial; Kirkpatrick's absence was unexplained. At the meeting, a discussion was had concerning the possibility of replacing PX 2 with a new five-year agreement, but no agreement was finalized at that meeting. Although further discussions were held and proposed drafts were exchanged during the next ten years, the parties never reached agreement concerning the removal of the equipment installed by plaintiff or, alternatively, plaintiff's right to compensation for that equipment should the proposed five-year contract not be renewed at the end of its term. Johnson was assured, however, that defendant would continue to receive the most favored nation treatment which had been promised and given to McKinney when PX 2 was negotiated. In keeping with that assurance, the percentage of concession revenue which defendant was to receive was increased commencing with the 1953 baseball season. That same percentage figure was also inserted in the drafts of the proposed new agreement.

During the course of the lengthy negotiations for a proposed new contract and thereafter for a modification to be effective when the Pirates moved to a new stadium, plaintiff assumed and asserted the validity of PX 2. Defendant did not contradict that position and never asserted until the time of trial the existence of a year to year agreement. On November 28, 1969, defendant advised plaintiff by letter that their contract would be terminated effective December, 1969. Thereafter, the contract was terminated and defendant contracted with another concessionnaire. This action for damages and injunctive relief followed and a trial limited to the two issues hereafter stated was held. Those issues are now before the Court for resolution.